**ARCHER DANIELS MIDLAND CO., Plaintiff,**

v.

**ECO, INCORPORATED d/b/a Eco Inc. and Eco 2007, L.L.C., d/b/a Eco, Inc., Defendant.**

No. 3:10–cv–52.

United States District Court,
S.D. Iowa,
Davenport Division.

Oct. 31, 2011.

---

Kevin J. Caster, Richard S. Fry, Nancy J. Penner, Jennifer E. Rinden, Shuttleworth & Ingersoll, Cedar Rapids, IA, for Plaintiff.

Rachel B. Crawford, Daniel R. Ketchum, J. Daniel Morgan, William W. O'Connor, Newton O'Connor Turner & Ketchum PC, Tulsa, OK, Michael L. Noyes, Lane & Waterman LLP, Davenport, IA, Jeffrey K. McGinness, Simmons Perrine Moyer & Bergman PLC, Cedar Rapids, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Chief Judge.

Before the Court are the following Motions: 1) a Motion for Summary Judgment, filed August 3, 2011 by Eco 2007, L.L.C. d/b/a Eco, Inc. ("Eco 2007"); and 2) a Motion for Partial Summary Judgment, filed August 10, 2011 by Eco, Incorporated, d/b/a Eco, Inc. ("Old Eco"). Clerk's Nos. 41–42. Archer Daniels Midland Company ("ADM") filed resistances to the Motions on September 6, 2011. Clerk's Nos. 46, 48. Eco 2007 and Old Eco filed replies on September 16, 2011 and September 20, 2011, respectively. Clerk's Nos. 53–54. A hearing was held on the pending Motions on October 25, 2011.

Clerk's No. 59. The matters are fully submitted.

## I. FACTUAL BACKGROUND

### A. *Old Eco*

Sometime in late 2004, ADM decided to replace an existing cogeneration plant at its Clinton, Iowa facility. Old Eco's Statement of Undisputed Facts Supporting Mot. for Partial Summ. J. (Clerk's No. 42–3) (hereinafter "Old Eco's Facts") ¶ 1. Don Frey, an ADM employee, was designated as the project's manager and was assigned a number of project engineers. *Id.* ¶ 2. One of the project engineers, Jason Habrock ("Habrock") was assigned responsibility for managing the purchase and construction of the project. *Id.* ¶ 3.

On June 9, 2005, Habrock sent specification materials to a number of potential manufacturers, including Old Eco, for "cost and delivery estimates ... for a bare tube economizer and a primary/secondary air heater pair for each of the three boilers [and for] the air heater to economizer transition duct" (hereinafter referred to as "Equipment"). *Id.* ¶ 4; ADM's Resp. to Old Eco's Facts (Clerk's No. 46–1) ¶ 4; Old Eco's App. (Clerk's No. 42–2) at 107–17. On July 1, 2005, Old Eco responded with an initial proposal for the supply of the Equipment. Old Eco's Facts ¶ 5; Old Eco's App. at 118–20.

On July 19, 2005, Old Eco sent a second proposal to ADM. Old Eco's Facts ¶ 7; Old Eco's App. at 121–23. This second proposal contained a page entitled "Terms and Conditions of Sale," which contains the following provision under the heading "Warranty and Exclusion of Other Warranties":

> 10.1 ECO warrants, to the original Customer only, the equipment sold to Customer to conform to the specifications set forth in the

Proposal and Invoice and shall be tested to indicate that same are free from structural defects in material and workmanship under normal recommended use for a period of one (1) year from the date of delivery to the original customer.

10.2 ECO warrants the equipment to perform at the minimum thermal efficiency and maximum pressure drop stated in the proposal for a period of one (1) year from date of delivery to the original customer. These values are understood to apply only when the unit is operated in accordance with the design process conditions stipulated in the proposal and in a new and clean condition. ECO does not warrant against erosion, natural wear or faulty operation.

10.3 This warranty does not apply to equipment or accessories manufactured by manufacturers other than ECO, which are separately warrantied by such other manufacturers. . . .

10.4 The obligation of ECO under this warranty shall be limited to the repair or replacement of any part which is judged defective by ECO. ECO will not be liable for transport time or income, or any other special or consequential damages of any kind or nature. Implied warranties, if any, shall be limited to the duration of this written limited warranty.

. . .

10.6 ECO shall not be liable for special or consequential damages, such as, but not limited to, damage for cost of replacement goods, or damages for claims of third parties against the Customer, or damages for loss of profits.

10.7 Notification of any warranty claim arising within the applicable warranty period, as set forth and mentioned above, must be made in writing by the original Customer within thirty (30) days after the discovery of the alleged basis for any warranty claim."

10.8 In no event shall the liability of ECO under this warranty exceed the purchase price of the specific item or items to which such warranty claim relates.

10.9 THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PURPOSE, WHETHER ARISING BY LAW, CUSTOM OR CONDUCT.

THE FOREGOING RIGHTS AND REMEDIES ARE EXCLUSIVE AND IN LIEU OF ANY OTHER RIGHTS OR REMEDIES WHATSOEVER, WHETHER STATUTORY OR OTHERWISE, AND WHETHER BASED ON A CONTRACT, TORT OR OTHERWISE.

Old Eco's App. at 123; Old Eco's Facts ¶ 20.

On July 20, 2005, James Roberson (the owner of Old Eco) (hereinafter referred to as "Roberson") and Ray Tarwater (an employee of Old Eco) (hereinafter referred to as "Tarwater") traveled to Clinton, Iowa for a meeting with ADM. ADM's Statement of Additional Material Facts (Clerk's No. 46–2) (hereinafter "ADM's Old Eco Facts") ¶ 3. Both parties admit that "[a]n agreement was reached at the July 20, 2005 meeting." *Id.* ¶ 4 (referencing Roberson's description of a "verbal agreement" on that date and Tarwater's statement that July 20, 2005, was "when the deal was made"); Old Eco's Resp. to

ADM's Old Eco Facts ¶ 4. On July 21, 2005, Tarwater sent Habrock an email stating, "Attached is confirmation of information discussed with Scott Young in meeting of July 20, 2005." ADM's App. at 19.[1] Attached to the email is a document that is similar to Old Eco's July 19, 2005 proposal. *Compare* Old Eco's App. at 121–23 *with* ADM's App. at 20–23. This new document, however, provides, among other things, modified pricing and tentative shipping dates, and states, "WARRANTY FOR EACH UNIT TO BE 12 MONTHS FROM START UP DATE." ADM's App. at 20–21. Though this document states, "PLEASE SEE ATTACHED TERMS AND CONDITIONS OF SALE," it does not have the page from the July 19, 2005 document captioned "Terms and Conditions of Sale" attached to it.[2] ADM's Facts ¶ 7; Old Eco's Resp. to ADM's Old Eco Facts ¶ 7. Shortly after receiving Old Eco's email and attachments, "Habrock responded to Old Eco's email on the same date and 'conveyed confirmation of the deal and provided ADM's purchase order number.'" ADM's Facts ¶ 5; Old Eco's Resp. to ADM's Old Eco Facts ¶ 5.

On August 30, 2005, ADM issued Purchase Order # 184637. Old Eco's Facts ¶ 10. The Purchase Order did not limit ADM's damages and warranty claims in the manner specified in Old Eco's "Terms and Conditions of Sale"; rather it provided additional or different terms and conditions, including a warranty of merchantability. ADM's Facts ¶ 8. Specifically, ADM's purchase order contains the following provision, under the caption, "Terms and Conditions of Purchase Order":

1. Provisions in Seller's confirmation or other writing of whatever kind inconsistent with or in addition to the terms of this purchase order shall not be binding upon Buyer unless expressly approved in a writing by Buyer making specific reference to the inconsistent or additional term or condition. If this purchase order acts as an acceptance of an offer by Seller, then Buyer's acceptance is made conditional on Seller's assent to any additional or different terms set forth herein. This purchase order is a final expression of the entire agreement of Buyer and Seller and is intended also as the complete and exclusive statement of all terms of that agreement. No evidence of any prior or contemporaneous agreement or negotiation, whether oral or written, or any evidence of course of dealing, usage of trade or course of performance may be used to contradict, explain or supplement this purchase order, nor may the same be used to establish that because of mistake the writing does not reflect the actual agreement of the parties.

ADM's App. at 27.

On September 14, 2005, Old Eco sent a letter to Habrock that included revised payment schedules, freight and cost for winterization. Old Eco's Facts ¶ 12. The letter reiterated that "WARRANTY FOR EACH UNIT TO BE 12 MONTHS FROM START UP DATE." ADM's App. at 29. It did not include a page with Old Eco's July 19, 2005 "Terms and Conditions of Sale." ADM's Facts ¶ 10; ADM's App. at 28–29.

---

1. ADM filed a single appendix in support of its resistances to both Old Eco's and Eco 2007's Motions.

2. Old Eco contends that the attachment to the July 21, 2005 email "specifically reference[s] the 'terms and conditions' that were provided in Eco's July 19, 2005 offering." Old Eco's Resp. to ADM's Old Eco Facts ¶ 7. The attachment, however, does not reference the July 19, 2005 document in any way. *See* ADM's App. at 20–21.

Old Eco began delivery of the Equipment to ADM's Clinton plant in May 2006,[3] with final delivery occurring in June 2007. Old Eco's Facts ¶ 13. Both Old Eco and ADM representatives proceeded in the transaction assuming that their own terms and conditions controlled. ADM's Facts ¶ 12. Indeed, the parties never specifically discussed the terms and conditions during any of the negotiations.[4] Id.

### B. Eco 2007

The corporate shares of Old Eco were wholly owned by Roberson. Eco 2007's Statement of Undisputed Facts Supporting Mot. for Summ. J. (Clerk's No. 41–2) (hereinafter "Eco 2007 Facts") ¶ 11. DJH, LLC (members include Donald J. Hoose and D. Justin Hoose) and RDJECO, LLC (members include Tarwater, Jon Sullivan ("Sullivan"), and Danny Lee Brasso) created Eco 2007, LLC under Oklahoma law on June 1, 2007. Id. ¶¶ 12–17.

On June 14, 2007, the same date the final shipment of Equipment was made from Old Eco to ADM, Eco 2007 acquired all of the assets of Old Eco for $5.3 million through an Asset Purchase Agreement ("APA"). Id. ¶¶ 7, 18. The APA provides:

> 3.1 *Excluded Liabilities.* Except for contract obligations duly assigned pursuant to Sections 1.1.5 and 1.1.6 [5] and work in process, which ECO commenced in the ordinary course of business prior to the Closing Date, and subject to Section 6.6,[6] Buyer shall neither assume nor agree to pay or discharge any liabilities or obligations of ECO of any kind.

Eco 2007 App. at 16. Under the APA, Eco 2007 acquired the right to use the name "ECO, Inc." in advertising, customer solicitation, business development, and for various other business purposes. Eco 2007 Facts ¶ 9. Old Eco, however, retained the right to the name "ECO, Inc." for the purposes of banking, investment, and associated activities relating to the winding down of the corporate entity of Old Eco, and the associated financial activities relating to the sale of Old Eco's assets to Eco

3. Though ADM admits that delivery began in May 2006, *see* ADM's Resp. to Old Eco's Facts ¶ 13, it contends in its own facts that the "first shipment [was] in March 2006." ADM's Facts ¶ 11. The Court is uncertain which date is correct given that Old Eco admits ADM's assertion regarding the first shipment in March 2006. *See* Old Eco's Resp. to ADM's Facts ¶ 11.

4. Old Eco asserts that the deposition testimony cited by ADM does not support ADM's assertion that "there was no discussion regarding [Old] Eco's terms and conditions." Old Eco's Resp. to ADM's Facts ¶ 12. Rather, Old Eco contends that the "testimony speaks for itself and shows that ADM employees received the terms and conditions and opted not to discuss those with Eco." *Id.* Old Eco does not, however, provide any citation to the record in support of its assertion in this regard.

5. Section 1.1 of the APA provides that "On the terms and subject to the conditions herein, ECO Agrees to sell ... to Buyer ... the following assets of the Business then owned by ECO in the conduct of the Business ... free and clear of any and all liens and encumbrances." An itemized list that follows contains section 1.1.5, which references "all interests and rights of ECO, to the extent assignable without consent, under the contracts, commitments, warranties, distributor agreements, vendor purchasing agreements, and customer orders and purchase orders, entered into or received as of the Closing Date under the Agreement," and section 1.1.6, which references "all other assets or interests to which ECO has any right by ownership or in which ECO has a conveyable or assignable interest on the Closing Date and which relate to the Business, including, but not limited to, advance rent and prepaid items held for use or intended to be used in or owned by the Business." *Id.* at 15.

6. Section 6.6 of the APA provides various provisions relating to the "[c]ut-off for Receivables: Accounts Payable." Eco 2007 App. at 21.

2007. *Id.* ¶ 10. Thus, after the sale of assets from Old Eco to Eco 2007, the business continued on as "Eco, Inc.," even though it was actually now Eco 2007. ADM's Statement of Additional Disputed and Undisputed Material Facts Precluding Eco 2007's Mot. for Summ. J. (Clerk's No. 48–3) (hereinafter "ADM's Eco 2007 Facts") ¶ 1.[7] Further, Eco 2007 employed nearly all of Old Eco's employees and continued to use its name, address, and contact information. *Id.* ¶ 4. Neither Old Eco nor Eco 2007 ever informed ADM of the asset sale or that "Eco, Inc." was being run by Eco 2007 after June 14, 2007. *Id.* ¶ 3.

The economizers that ADM purchased from Old Eco began experiencing leaks in the welds in approximately September 2008. *Id.* ¶ 5. ADM promptly contacted "Eco, Inc." and spoke to Sullivan about the equipment failure.[8] *Id.* ¶ 6. According to Eco 2007, it saw the report of weld failures as an opportunity to establish a good business relationship with ADM, a "potential multi-million dollar account." Eco 2007 Facts ¶ 20 ("A potential multi-million dollar account is something worth securing for the future. Developing a good relationship with decision-makers at ADM would be a worthwhile marketing strategy for ECO 2007. As a result, executives of

ECO 2007 communicated with ADM, not arising from any responsibility for the problems, but out of a very understandable hope of future business."). According to ADM, however, rather than inform ADM that it should be looking to Old Eco for relief, Eco 2007 "undertook substantial activity to address the equipment failures" between October 2008 and April 2009. ADM's Br. in Resistance to Eco 2007s's Mot. for Summ. J. (hereinafter "ADM's Eco 2007 Br.") at 3. In particular, ADM contends Eco 2007 undertook the following actions, without ever informing ADM that Eco, Inc. was now operated by Eco 2007 rather than Old Eco, and without informing ADM that it should be looking to Old Eco for warranty service: 1) ADM was instructed to contact Eco 2007 to report equipment problems or to obtain repairs; 2) Eco 2007 employees were put in charge of handling ADM's equipment problems; 3) Eco 2007 involved the manufacturer of the equipment, Wahlco, to attempt to fix the weld problems; 4) Eco 2007 undertook, and paid for, its own affirmative steps to investigate the weld problems, including hiring an engineer to assist in evaluating the issues, having a weld analyzed, shipping tubes to ADM for repairs, and sending its own employees to the Clinton, Iowa plant to help; 5) Eco 2007 assumed responsibility to pay ADM's invoice for installation issues[9]; 6) Eco 2007 ar-

---

7. Eco 2007 did not file a response to ADM's Eco 2007 Facts. Accordingly, the facts contained therein are deemed admitted. *See* LR 56(d) ("The moving party must, within 7 days after service of the resisting party's statement of additional facts, file a reply in which the moving party expressly admits, denies, or qualifies each of the resisting party's numbered statements of additional fact.... The failure to reply, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.").

8. Sullivan was an employee of both Old Eco and an employee/owner of Eco 2007. ADM's Eco 2007 Facts ¶ 6.

9. On September 11, 2007, ADM sent invoices to "Eco, Inc." for payment totaling $30,447.53, for expenses incurred by ADM in relation to the "'rework' of installation of certain air heaters originally supplied to ADM" by Old Eco. Eco 2007 Facts ¶ 21. Eco 2007 claims that it contacted both Wahlco and Roberson about the invoices. *Id.* ¶ 22. Roberson advised Eco 2007 that "he would pay only $5,000.00 toward the invoices because [Old Eco] was no longer in existence, and he did not have the ability to recoup the charges." *Id.* ¶ 23. Wahlco purportedly agreed to pay $22,257.13 toward the invoices, and entered into a payment plan with Eco 2007 to pay this sum since it lacked sufficient cash on hand. *Id.* ¶ 24. Eco 2007 claims it "made a business decision to voluntarily pay

rived at its own conclusion that any potential warranties were void because of ADM's startup process; and 7) Eco 2007 expressly referred to Old Eco's design notes and terms and conditions as "ours" and committed to be "responsive and diligent *in all matters with ADM.*" ADM's Eco 2007 Facts ¶¶ 12, 16; ADM's Resp. to Eco 2007 Facts ¶ 20.

ADM contends that, since it had no knowledge—and no way to find out—that Eco 2007 was not Old Eco, it was Eco 2007's responsibility to notify Old Eco of ADM's problems. ADM's Eco 2007 Facts ¶ 18. It is disputed whether Eco 2007 provided timely notice to Old Eco in this regard. *Id.* ¶ 19. On April 30, 2009, counsel for Eco 2007 wrote ADM and informed it, for the first time, that Eco 2007 was not Old Eco, and that Eco 2007 was taking the position that it was not liable as a successor to Old Eco for ADM's Equipment failures. *Id.* ¶ 17.

ADM filed its Amended Complaint on April 27, 2010. Clerk's No. 2. Therein, ADM asserts claims against Old Eco and Eco 2007 for: 1) breach of express warranty; 2) breach of implied warranty of fitness for a particular purpose; 3) breach of

implied warranty of merchantability; and 4) breach of contract.[10]

## II. SUMMARY JUDGMENT STANDARD

■ The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions,* 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[11] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[12] *Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

---

the remaining $3,190.40 of ADM's invoices with the goal of fostering a first-rate business relationship with ADM in the hope of receiving multi-million economizer orders from ADM in the future." *Id.* ¶ 25. ADM counters, however, that regardless of Eco 2007's claimed reasons for paying the invoice, "a reasonable jury could find Eco 2007 paid ADM's invoice because Eco 2007 had assumed liability for ADM's purchase order." ADM's Resp. to Eco 2007 Facts ¶ 25.

**10.** ADM also filed a claim entitled "Third Party Beneficiary" against Wahlco Fabricators, Inc. *See* Am. Compl. The Clerk of Court entered Wahlco's default on September 17, 2011. *See* Clerk's No. 29.

**11.** Judge Hornby, a District Court judge for the District of Maine, convincingly suggests

that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

**12.** Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "[S]ummary judgment ... is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact." (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.*, 398 F.Supp. 1047, 1055 (E.D.N.Y.1975))).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the non-

moving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

■ Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed. 1998)).

## III. LAW AND ANALYSIS [13]

### A. *Old Eco's Motion for Partial Summary Judgment*

Old Eco asserts in its Motion for Partial Summary Judgment that "[o]n August 30, 2005, ADM accepted [Old Eco's July 19, 2005 revised proposal], along with the terms and conditions attached thereto." Old Eco's Mot. at 1. According to Old Eco, ADM's "issuance of a purchase order in response to [Old Eco's] offer contained no inconsistent or additional warranty terms and, therefore, constituted acceptance" under applicable provisions of the Uniform Commercial Code ("UCC"). *Id.* at 1–2.

Thus, Old Eco seeks summary judgment on "Plaintiff's claims for indirect damages" because such claims are "barred by the specific terms and condition and warranty limitations contained in the accepted July 19, 2005, offer." *Id.* at 2. Additionally, Old Eco asserts that ADM's claims of breach of implied warranties of fitness and merchantability fail because "Plaintiff admits they failed to provide [Old Eco] with proper, timely and adequate notice of the alleged failures prior to filing the present suit." *Id.*

### 1. *Offer and acceptance.*

Old Eco altered its position somewhat at the October 25, 2011 hearing. While Old Eco maintains that the July 19, 2005 proposal was an "offer," it now contends that the acceptance of that offer occurred on July 20, 2005, based on ADM's admission that "[a]n agreement was reached at the July 20, 2005 meeting." *See* ADM's Old Eco Facts ¶ 4; Old Eco's Resp. to ADM's Old Eco Facts ¶ 4 (admitting that "[a]n agreement was reached at the July 20, 2005 meeting"); Hr'g Tr.[14] at 14–18 (counsel for Old Eco stating that its position "has changed substantially based upon some key admissions contained in response briefs" and that the acceptance of Old Eco's July 19, 2005 offer occurred at the July 20, 2005 meeting). Thus, Old Eco maintains that the warranty exclusions and limitations articulated in the "Terms and Conditions" page of its July 19, 2005 proposal effectively became part of the contract between ADM and Old Eco by virtue

---

**13.** The Court applies Iowa law under traditional choice of law rules and because the parties all appear to agree that Iowa law is applicable to the issues in this case. *See* Old Eco's Br. (citing Iowa law in support of its Motion); ADM's Old Eco Br. (explaining why Iowa law is applicable); Eco 2007 Br. (citing both Iowa and Oklahoma law); ADM's Eco 2007 Br. (explaining why Iowa law applies, noting that Oklahoma law is arguably applicable to successor liability issues involving the APA, but explaining that Oklahoma and Iowa laws are consistent on successor liability).

**14.** References to the Hearing Transcript are to the unedited RealTime transcript provided to the Court by the court reporter.

of ADM's purported acceptance of the July 19, 2005 "offer."

The facts in this case are largely undisputed and the parties are now in agreement that, by no later than the conclusion of the July 20, 2005 meeting, ADM and Old Eco entered into a contractual agreement whereby Old Eco would supply Equipment to ADM. The parties disagree, however, about what terms and conditions are applicable to that contractual arrangement. More specifically, Old Eco contends that the warranty limitations listed in its July 19, 2005 proposal are part of the parties' contract, whereas ADM contends they are not. As the court in *Verasun Fort Dodge, L.L.C. v. Industrial Air Technology Corp.* stated, "[a] determination of the terms of the contract between [the parties] must begin with identification of the offer and acceptance." No. C07–3013, 2008 WL 5069121, at *15 (N.D.Iowa Nov. 25, 2008).

■ Iowa's UCC is applicable to the transaction between Old Eco and ADM because the Equipment contracted for qualifies as "goods" under Iowa Code § 554.2105(1) (" 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action."). The UCC does not define the term "offer"; accordingly, the Court looks to Iowa common law to determine whether the July 19, 2005 proposal constitutes an offer. *See Nordyne, Inc. v. Int'l Controls & Measurements Corp.*, 262 F.3d 843, 846 (8th Cir.2001) (looking to state common law and the Restatement of Contracts for definition in light of the fact that the "UCC does not define 'offer' "); *see also S & S, Inc. v. Meyer*, 478 N.W.2d 857, 861 (Iowa Ct.App.1991) ("Unless displaced by the UCC, other statutes and the common law supplement [the UCC's] provisions.").

■ "An offer is a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' " *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 26 (Iowa 1997) (quoting *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 285 (Iowa 1995)); *see also Heartland Exp., Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001) ("The test for an offer is whether it induces a reasonable belief in the recipient that the recipient can, by accepting, bind the sender." (citations omitted)). The existence of an "offer" must be determined objectively, not subjectively. *Heartland Exp.*, 631 N.W.2d at 268. "[I]f an offer is indefinite, there is no intent to be bound." *Anderson*, 540 N.W.2d at 286.

■ Generally speaking, "a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract." *White Consol. Indus., Inc. v. McGill Mfg. Co., Inc.*, 165 F.3d 1185, 1190 (8th Cir.1999). For instance, in *Litton Microwave Cooking Products v. Leviton Mfg. Co.*, Leviton provided a price letter to Litton for certain switches. 15 F.3d 790, 792 (8th Cir.1994). Litton selected Leviton as a vendor for the switches and Leviton periodically provided Litton with updated price letters. *Id.* Each price letter was accompanied by a copy of Leviton's "Standard Terms and Conditions of Sale," which included certain warranty limitations. *Id.* at 793. Noting that the price letters and catalogs sent by Leviton to Litton were "clear, definite, and explicit," the Court of Appeals nonetheless found them insufficient to constitute an offer because they left too many matters open for negotiation. *Id.* at 795 (finding matters left "open" included: "When and where might the parts listed be delivered? Was Litton obligated to purchase all the parts

listed in the quantities listed, or might they be able to purchase just what was necessary to fill their needs by picking and choosing from the parts listed? Could Litton feel justified, based on the quotation letters alone, in finding Leviton in breach of contract if Leviton were to be unable to fill any purchase order submitted?").

In *White*, by contrast, White Consolidated Industries, Inc. ("White") contacted McGill about obtaining a certain electrical switch for use in a new line of freezers. 165 F.3d at 1186. McGill responded with a sample of the switch and a price quotation setting forth conditions of sale—including a term that limited McGill's warranty obligations to refund or replacement of the switches—on the reverse side. *Id.* at 1190. The Eighth Circuit found McGill's price quotation was "sufficiently detailed" to constitute an offer because McGill "provided that its offer was subject to immediate acceptance by [White]" and because the "open terms that prevented the price quotation from being a valid offer in *Litton*" were not present in the case. *Id.*

■ Two years later, in *Nordyne*, the Eighth Circuit stated that relevant factors in determining whether a price quotation is an offer "include the extent of prior inquiry, the completeness of the terms of the suggested bargain, and the number of persons to whom the price quotation is communicated." 262 F.3d at 846 (finding under Missouri law that "a price quotation, 'if detailed enough, can amount to an offer creating the power of acceptance; to do so it must reasonably appear from the price quote that assent to the quote is all that is needed to ripen the offer into a contract' ") (quoting *Brown Mach., Div. of John Brown, Inc. v. Hercules, Inc.*, 770 S.W.2d 416, 419 (Mo.Ct.App.1989)). Applying these factors in *Verasun*, the Northern District of Iowa found a price quotation similarly sufficiently definite to quality as an offer. *See* 2008 WL 5069121, at *15–16.

In particular, the district court noted that the price quotation at issue was solicited and, thus, "was not the initial substantive contact between the parties"; the price quotation "contained all the necessary elements of an offer," including a complete description of the product with corresponding performance charts, quantity, price, anticipated delivery date, and general provisions about length of warranty; the price quotation was "a specific quotation custom-designed for a specific customer at that customer's request and not a generalized or unsolicited quote sent to a number of potential customers"; the parties did not engage in any further negotiations between the issuance of the price quotation and the other party's purchase order; and the price quotation "does not contain any reservation of any right to accept or reject any order submitted in response to its quotation." *Id.* at *16.

■ In this case, Old Eco argues that the July 19, 2005 proposal "is similar to the price quotation in *Verasun*." Old Eco's Br. at 8. Specifically, Old Eco contends that its July 19, 2005 proposal "was not the first contact between the two parties"; "was not an unsolicited quote sent to multiple parties but was directed specifically at ADM to address its needs"; contained "detailed descriptions of the [Equipment] and the specific costs for the goods" and specified delivery dates; and contained "detail[ed] warranty information, including the length of applicable warranties." *Id.* at 8–9. Thus, Old Eco concludes, its July 19, 2005 "proposal left little 'open for negotiation' and meets the requirements to constitute an offer." *Id.* at 9.

The Court agrees with Old Eco that, similar to *Verasun*, the July 19, 2005 proposal was directed specifically at ADM as the result of a solicitation by ADM. Indeed, ADM "sent a specification sheet to a

number of potential manufacturers for the Equipment, including [Old Eco]." [15] Old Eco's Facts ¶ 4. The Court further agrees that the July 19, 2005 proposal contained relatively complete terms. It listed individual component prices for three sets of economizers and air heaters, provided shipping dimensions and weights for the Equipment, provided that approval drawings "can be submitted 2 to 3 weeks after order," stated that delivery of the first set would be 26 to 28 weeks after receipt of approved drawings with additional sets to be delivered according to ADM's schedule, and noted that Eco could store the equipment at no additional charge. Old Eco's App. at 121. The proposal also contained a request for a particular payment schedule and referenced "attached terms and conditions of sale." *Id.* at 121–22.

On the ultimate test of whether the July 19, 2005 proposal would "induce[ ] a reasonable belief in [ADM] that [ADM could], by accepting, bind [Old Eco]," however, the Court finds this case distinguishable from *Verasun. Heartland Exp.*, 631 N.W.2d at 268. That is, the "Terms and Conditions of Sale" contains no less than three separate provisions that, when viewed in the light most favorable to ADM, warrant a reasonable conclusion that the July 19, 2005 proposal was not an offer, but rather was an invitation to ADM to extend an offer to Old Eco.

First, the "Terms and Conditions of Sale" provides under the heading "Contract":

> Acknowledgment *and acceptance of Customer's Purchase Order* by [Old Eco] shall be conditioned, however, upon Customer's assent to all of the terms and conditions contained herein. No terms or conditions other than those stated herein, whether contained in Customer's

> Purchase Order or shipping release or elsewhere, and no written or oral agreement that purports to vary these terms and conditions, shall be binding upon [Old Eco] unless hereafter set forth in writing signed by [Old Eco].

Old Eco's App. at 123 (emphasis added). Likewise, under the heading "Prices," the document provides that the prices in the proposal "are firm for a period thirty days," but that "[a]fter such period, Customer agrees to pay the prices adjusted *as of the date of acceptance of Customer's Purchase Order.*" *Id.* (emphasis added). Finally, under the heading "Transportation," the Terms and Conditions state: "All orders *accepted* by [Old Eco] will be shipped F.O.B. point of manufacture...." *Id.* (emphasis added). Thus, unlike *Verasun,* the price quotation sent by Old Eco to ADM *does* contain a limitation that can reasonably be construed as a reservation of right by ADM to "accept or reject any order submitted in response to its quotation." *Verasun,* 2008 WL 5069121, at *16. As such, the Court cannot conclude, as a matter of law, that the July 19, 2005 proposal was an offer. *See, e.g., J.D. Fields & Co. Inc. v. U.S. Steel Int'l, Inc.,* 426 Fed. Appx. 271, 277–78 (5th Cir.2011) (finding that a price quotation *could* be considered an offer where it, among other things, "contained no language of approval, or any other indicia suggesting that an order would be subject to approval before it was accepted"); *Architectural Metal Sys., Inc. v. Consol. Sys., Inc.,* 58 F.3d 1227, 1230 (7th Cir.1995) ("A person can prevent his [price quote] from being treated as an offer by suitable language conditioning the formation of a contract on some further step ... such as approval by corporate headquarters."); *Rush–Presbyterian–St.*

---

**15.** A company called Kentube also responded with a proposal to ADM's solicitation on July 8, 2005. Old Eco's Facts ¶ 6.

*Luke's Med. Ctr. v. Gould Inc.*, No. 93C1661, 1995 WL 340967, at *5 (N.D.Ill. June 2, 1995) ("A price quotation that is subject to the seller's confirmation is not an offer since the buyer's assent will not consummate the contract.").

The Court further notes that, even assuming that the July 19, 2005 proposal was an offer, there remain genuine issues of material fact as to whether that specific offer was actually accepted by ADM. Both parties agree that "[a]n agreement was reached at the July 20, 2005 meeting." ADM's Old Eco Facts ¶ 4. However, the facts regarding what was actually discussed at the July 20, 2005 meeting are sketchy at best,[16] and certainly not sufficiently developed to permit the Court to determine as a matter of law that ADM "accepted" the July 19, 2005 proposal. Indeed, it is undisputed that at least one of the terms of the July 19, 2005 proposal—a provision in the "Terms and Conditions of Sale" providing that the warranty would extend "for a period of one (1) year from date of delivery"—was *not* adopted at the July 20, 2005 meeting, given that the parties instead opted for a one year warranty from the date of "start-up." The UCC specifically permits a contract for the sale of goods to be "made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of ... a contract." Iowa Code § 554. 2204. Thus, contrary to Old Eco's assertion that ADM *must have* accepted its July 19, 2005 "offer" at the July 20, 2005 meeting, *see* Old Eco's Reply Br. at 3 ("These three days of an offer, agreement, and confirmation alone support a finding in [Old Eco's] favor." [17]), it is equally plausible that the contract between Old Eco and ADM was formed via their discussions and conduct at the July 20, 2005 meeting, rather than by traditional mechanisms of formal offer and acceptance.

Old Eco's Motion presumes that the July 19, 2005 proposal is an offer that was subsequently accepted by ADM at the July 20, 2005 meeting. It then argues that the warranty limitations included in the July 19, 2005 "Terms and Conditions of Sale" became part of the parties' agreement, such that ADM's claims for indirect damages and for breach of implied warranties of fitness and merchantability are defeated. However, because there are genuine issues of material fact as to how contract formation occurred in this case, summary judgment in favor of Old Eco on its claims is improper.

### 2. *Failure by ADM to give notice.*

Old Eco additionally argues that ADM failed to provide notice to Old Eco of the problems it was experiencing. As its basis for the notice requirement, however, Old Eco points primarily to a provision of the "Terms and Conditions of Sale" attached to the July 19, 2005 proposal that provides, "[n]otification of any warranty claim arising within the applicable warranty period, as set forth and mentioned above, must be made in writing by the original Customer within thirty (30) days after the discovery of the alleged basis for any warranty claim." *See* Old Eco's Br. at 14; Old Eco's App. at 123. This claim fails for the reasons discussed previously, namely, because the Court cannot conclude as a matter of law that the July 19, 2005 proposal was an offer, and even if it was, it is not clear that it was accepted by ADM. Thus, it is not settled, as Old Eco contends, that the warranty limitations, including the notification provision, became part of the parties' con-

---

16. Old Eco does not even refer to—let alone discuss—the July 20, 2005 meeting in its initial summary judgment papers.

17. The "confirmation" referenced by Old Eco refers to an exchange of emails between Tarwater and Habrock on July 21, 2005. *See* ADM's App. at 19.

tract. To the extent that Old Eco asserts that this same notice provision was included in a Service and Maintenance Manual provided by Old Eco to ADM, *see* Old Eco's Facts ¶ 18, Old Eco's argument is equally unconvincing because it is also not clear that terms set forth in the Service and Maintenance Manual comprised part of the parties' agreement.

■ To the extent that ADM was required to give notice of its warranty claims to Old Eco generally, there are clearly genuine issues of material fact as to whether ADM's act of contacting Eco 2007, using the specific contact information Old Eco instructed ADM to use for such purposes, was sufficient notice under the facts and circumstances of this case. *See* Iowa Code § 554.1202(4) ("A person 'notifies' or 'gives' a notice or notification to another person by taking such steps as may be *reasonably required* to inform the other person in ordinary course, whether or not the other person actually comes to know of it." (emphasis added)); *Dailey v. Holiday Distrib. Corp.*, 260 Iowa 859, 151 N.W.2d 477, 487 (1967) ("What is reasonable both as to form and time of notice is determinable according to the factual situation presented in each individual case."). Indeed, it is difficult to imagine what more ADM could have done to provide notice to Old Eco, given that it was never made aware that the entity it had contacted was not Old Eco.[18] Moreover, "notice" typically includes "actual knowledge." *See* Iowa Code § 554.1202. Though Roberson has

testified that he did not receive notice from Eco 2007 of ADM's problems until March 2009,[19] a representative of Eco 2007 claims to have informed Roberson of ADM's complaints in the fall of 2008. *See* ADM's App. at 132 (Sullivan testifying that "the first thing we did [after ADM reported to Eco 2007 of leaks in October 2008] was we notified Jim Roberson and Wahlco that there was an issue"). A reasonable jury could find on the facts presented that ADM's notice to Old Eco was entirely reasonable under the circumstances.

### B. *Eco 2007's Motion for Summary Judgment*

■ "As a general rule, a corporation that purchases the assets of another corporation assumes no liability for the transferring corporation's debts and liabilities." *Pancratz v. Monsanto Co.*, 547 N.W.2d 198, 200 (Iowa 1996). Four exceptions to this general rule are recognized, however: "1) the buyer agrees to be held liable; 2) the two corporations consolidate or merge; 3) the buyer is a 'mere continuation' of the seller; or 4) the transaction amounts to fraud." *Id.*

■ Eco 2007 argues that it is entitled to summary judgment on all of ADM's claims against it because it merely purchased Old Eco's assets, did not assume responsibility for the debts and liabilities of Old Eco, and because none of the exceptions to corporate successor non-liability is applicable. *See generally* Eco 2007 Br. ADM concedes that the second, third, and

---

**18.** Old Eco argues that it has "been unable to locate any Iowa authority that would eliminate ADM's notice requirement based upon [the] excuse" that ADM "was unaware of the sale of [Old Eco] to Eco 2007." Old Eco's Br. at 15. In its Reply Brief, Old Eco further argues that ADM has "failed to provide any support for their assertion that [Old] Eco or Eco 2007 'could have, or should have' provided ADM notice of the transaction." Old Eco's Reply at 5. On a Motion for Summary Judg-

ment, however, the burden is on the movant—in this case, Old Eco—to establish its entitlement to judgment as a matter of law.

**19.** Old Eco's implication that the notice to Old Eco was deficient because it was provided by Eco 2007 rather than by ADM, *see* Old Eco's Resp. to ADM's Old Eco Facts ¶ 24, is unpersuasive given that there is no dispute that Old Eco had actual knowledge no later than March 2009.

fourth exceptions are not applicable in this case. It maintains, however, that "there are multiple fact issues as to whether the first exception" applies. ADM's Eco 2007 Br. at 6. Specifically, ADM argues that a jury could find that Eco 2007 is liable for ADM's claims under the express provisions of the APA, or that Eco 2007 impliedly agreed to assume liability for ADM's claim. *See generally* ADM's Eco 2007 Br.

In support of its position, Eco 2007 points to § 3.1 of the APA, which provides:

> *Excluded Liabilities.* Except for contract obligations duly assigned pursuant to Sections 1.1.5 and 1.1.6 and work in process, which ECO commenced in the ordinary course of business prior to the Closing Date, and subject to Section 6.6, Buyer shall neither assume nor agree to pay or discharge any liabilities or obligations of ECO of any kind.

Eco 2007 App. at 16. Eco 2007 argues that this provision makes it "evident that [Old Eco] and Eco 2007 did not intend for Eco 2007 to assume any of the debts and liabilities of [Old Eco], other than those specifically excepted." Eco 2007 Br. at 11. Eco 2007 further argues that ADM's purchase order for the Equipment "was not one of the contract obligations assigned pursuant to Sections 1.1.5 or 1.16. The purchase order was not a 'work in process' at the signing of the Asset Purchase Agreement as the final shipment was made prior to June 14, 2007." *Id.*

The Court cannot agree with Eco 2007 that the language of the APA clearly and unambiguously excludes Eco 2007 from any liability in the present case.[20] Section 3.1 explicitly provides that Eco 2007 would not assume or agree to pay any liabilities of Old Eco "[e]xcept for": 1) "contract obligations duly assigned pursuant to Sections 1.1.5 and 1.1.6" and 2) "work in process, which [Old Eco] commenced in the ordinary course of business prior to the Closing Date."

Regarding the potential that Eco 2007 assumed liability for "contract obligations duly assigned pursuant to Sections 1.1.5 and 1.1.6," Section 1.1.5 provides that Eco 2007 purchased "all interest and rights of [Old Eco], to the extent assignable without consent, *under the contracts,* commitments, *warranties,* distributor agreements, vendor purchasing agreements, and customer orders and *purchase orders, entered into or received as of the Closing Date under the Agreement.*" Eco 2007 App. at 15 (emphasis added). Though Eco 2007 argues that ADM's purchase order "was not one of the contract obligations assigned" pursuant to this section, it has not pointed to any evidence in the record supporting this contention. Indeed, an equally plausible reading of the plain language of Sections 3.1 and 1.1.5 of the APA, supports a conclusion that Eco 2007 expressly assumed Old Eco's interest in *contract obligations*[21] with respect to ADM's purchase order, which was indisputably "entered

---

**20.** To the extent that Eco 2007 argues that "ADM has no standing to challenge the understanding of the parties to the APA," the Court finds Eco 2007's argument without merit. *See* Eco 2007 Reply Br. at 2. ADM is not attempting to assert a claim under the APA in this case, as it would clearly lack standing to do so. Rather, ADM is using the APA to attempt to demonstrate which of Old Eco or Eco 2007 has liability with respect to its claims. Most cases cited by the parties, as well as others dealing with the issue of the exceptions to successor non-liability, routinely

use purchase agreements in this manner. Moreover, the Court notes that Eco 2007 has failed to offer any record citations in support of its assertion that "parties to the APA completely agree" that "all liability for the ADM transaction remained with OLD ECO." Eco 2007 Reply Br. at 2. Indeed, the Court is not aware of any statement by Old Eco that espouses a position that Old Eco alone bears liability in this action.

**21.** The reference in Section 3.1 of the APA to "contract obligations" is important. As ADM suggests, "Section 3.1 may have successfully

into or received" by the Closing Date of the APA, June 14, 2007. Indeed, as ADM points out, the "APA does not include a schedule or exhibit identifying or listing contracts, purchase orders, and other instruments intended by the parties to be included in Section 1.1.5." Thus, there are genuine issues of material fact as to whether Eco 2007 assumed Old Eco's contractual obligations regarding ADM's Purchase Order.

Likewise, with respect to Eco 2007's contention that ADM's Purchase Order was not a "work in process" as that term is used in Section 3.1 of the APA, the Court also finds genuine issues of material fact. Though Eco 2007 points out that the final shipment of Equipment under ADM's Purchase Order was shipped prior to the Closing Date of the APA, the only evidence in the record regarding "work in process" are two handwritten lists created by Sullivan, who was both an employee of Old Eco and an owner of Eco 2007. Specifically, on June 6, 2007, Sullivan created a list that he contends was a list of Old Eco's "work in process" which included ADM's Purchase Order. *See* Eco 2007 App. at 5 (Sullivan affidavit stating: "On June 6, 2007, as an employee of [Old Eco], I made a handwritten list of all of [Old Eco's] work in process. This list included [ADM's purchase order]."); *id.* at 142 (June 6, 2007 list). Then, on July 2, 2007, Sullivan made a list of Eco 2007's "work in process," which did not include ADM's Purchase Order. *See id.* at 6 (Sullivan affidavit stating: "On July 2, 2007, I made a handwritten list of all of Eco 2007's work in process. This list does not include (ADM's Purchase Order), as all work related to this purchase order had been completed by [Old Eco] prior to the closing date of June 14, 2007."); *id.* at 143 (July 2, 2007 list).

The APA between Old Eco and Eco 2007 does not define the phrase "work in process," nor does it contain an addendum identifying what the parties considered to be "work in process." Though Sullivan attests his handwritten lists identify "work in process," there is nothing in the record connecting Sullivan's lists to the APA. Indeed, Sullivan's handwritten lists do nothing to convince the Court, as a matter of law, that ADM's Purchase Order was not a "work in process" on June 14, 2007. Neither list identifies itself as "work in process," there is no evidence that Old Eco played any role in, or approved of the lists, and most significantly, they do not indicate in any way the status of "work in process" on June 14, 2007, the relevant date under the APA.

 Finally, the Court also rejects Eco 2007's assertion that the record is devoid of evidence from which a reasonable jury could find that it impliedly assumed Old Eco's contractual obligations with respect to ADM's purchase order.[22]

---

limited Eco 2007's liability for tort claims arising from purchase orders entered into as of the Closing Date," but "ADM does not bring tort claims." ADM's Eco 2007 Br. at 7 n. 11.

**22.** Iowa cases generally state the first exception to successor non-liability applies where "the buyer agrees to be held liable" or where "there is an agreement to assume such debts or liabilities." *See, e.g., Pancratz,* 547 N.W.2d at 201; *DeLapp v. Xtraman, Inc.,* 417 N.W.2d 219, 221 (Iowa 1987). The Court has not found an Iowa case that specifically discusses whether the agreement to be held liable can

be implied. Most jurisdictions that recognize the four exceptions to successor non-liability, however, find that the first exception applies when there is either an express or implied agreement to assume liability, but limit the availability of the implied agreement exception in situations "where the contract provision negating liability is clear and unambiguous." *U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co.,* 719 F.Supp.2d 1020, 1029 (S.D.Ind.2010); *see also Florom v. Elliott Mfg.,* 867 F.2d 570, 575 (10th Cir.1989) (finding that explicit liability limitations weigh against the finding of an implied excep-

"An implied agreement is one in which the agreement is inferred from the acts or conduct of the parties, instead of being expressed by them in written or spoken words." *Ambrose v. Southworth Prods. Corp.*, 953 F.Supp. 728, 735 (W.D.Va.1997) (internal quotation marks and citation omitted). The Fourth Circuit has identified relevant factors to be considered in determining whether an implied agreement to assume liability has been made to include: 1) whether the successor used the same name as the predecessor; 2) whether the successor took credit for the predecessor's work; 3) whether the successor assumed responsibility for completing a project; 4) whether the successor made efforts to collect money on a project; and 5) whether a successor participated in repairs to the predecessor's work. *See City of Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 450–51 (4th Cir.1990).

■ Despite the fact that Eco 2007 maintains that all actions it took were in the "hope[ ] that ADM would become a customer of Eco 2007," a jury could reasonably infer otherwise based on the evidence in the record. Among other things, over a period of approximately seven months, Eco 2007 used Old Eco's name, Eco, Inc., in conducting business; took steps to ensure payment of installation costs invoiced by ADM and even paid some of the costs itself; took affirmative steps to investigate and remedy ADM's problems, including having a weld analyzed, shipping repair parts, sending its own employee's to ADM's plant, and retaining an engineer to aid in evaluation; and determining that ADM's warranties were void in a letter telling ADM to refer to "*our* design notes ... and warranty

statement 10.1 and 10.2 of *our* Terms and Conditions located in your operating manual," all while never revealing to ADM that it was not Old Eco and was not liable for ADM's claims. *See* ADM's App. at 46 (emphasis added); ADM's Eco 2007 Facts ¶ 16. Particularly when considered in light of Sullivan's testimony that he promptly notified Roberson of ADM's problems, *see* ADM's App. at 132, a jury could reasonably conclude that an implied agreement existed between Old Eco and Eco 2007 whereby Eco 2007 agreed to assume liability for the problems ADM was experiencing with the Equipment. Accordingly, Eco 2007 has failed to show an entitlement to summary judgment.

### IV. CONCLUSION

For the reasons stated herein, Old Eco's Motion for Partial Summary Judgment (Clerk's No. 42) and Eco 2007's Motion for Summary Judgment (Clerk's No. 41) are DENIED.

IT IS SO ORDERED.

tion); *Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 845 (9th Cir.1992) (finding it "implausible" that a company that expressly and carefully set forth its liability limitations would then gratuitously agree to assume liability).

The Court presumes for purposes of the present Motion that Iowa would, in fact, recognize an exception to successor non-liability based on an implied agreement.